(INND Rev. 1/21)

FILED
2022 DEC 16  AM 10: 16
DIST. COURT CLERK
NORTHERN DISTRICT
INDIANA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

*[Use this form to sue for employment discrimination. NEATLY print in ink (or type) your answers.]*

*filing fee paid $402.00 recpt 183*

__Jacob Robert Cable__,

*[You are the PLAINTIFF, print your full name on this line.]*

v.

__Kuraray America Inc. & Kuraray MonoSol LLC__

*[The DEFENDANT is who you are suing.]*

Case Number __3:22cv1031__

*[For a new case in this court, leave blank. The court will assign a case number.]*

*[The top of this page is the caption. Everything you file in this case must have the same caption. Once you know your case number, it is VERY IMPORTANT that you include it on everything you send to the court for this case. DO NOT send more than one copy of anything to the court.]*

## EMPLOYMENT DISCRIMINATION COMPLAINT

1. My address is: __2411 N 400 W, LaPorte, IN 46350__

2. My telephone number is: (__219__) __575-9585__

3. The Defendant's address is: __Kuraray America, Inc. 2625 Bay Area Blvd, Ste. 600, Houston, TX 77058 ; Kuraray MonoSol 7070 E. 80th Place, Merrillville, IN 46410__

4. This action is brought for employment discrimination pursuant to:

   ☒ Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.
     *[race, color, gender, religion, national origin]*

   ○ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 to 634.

   ☒ Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117.

   ☒ Other: __NLRA or the Act; 29 U.S.C. §§151-169__

5. I filed a charge of discrimination with the Equal Employment Opportunity Commission or the Indiana Civil Rights Commission on: __Amended Charge filed on 8/16/2022__

6. The date on my Notice of Right to Sue letter is: __9/20/2022__

7. The date I received my Notice of Right to Sue letter was: __9/20/2022__

*[DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.]*

## CLAIMS and FACTS

DO: Write a short and plain statement using simple English words and sentences.

**DO NOT**: Quote from cases or statutes, use legal terms, or make legal arguments.

DO: Explain when, where, why, and how the defendant discriminated against you.

DO: Include every fact necessary to explain your case and describe your injuries or damages.

DO: Number any documents you attach and refer to them by number in your complaint.

**DO NOT**: Include social security numbers, dates of birth, or the names of minors.

DO: Number your paragraphs. [*The first paragraph has been numbered for you.*]

1.   Please see Attachment #2 Particulars of Charge and Attachment #3 NLRB Affidavit for claims and facts.

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

RELIEF – If you win this case, what do you want the court to order the defendant to do?

Seeking recovery of lost wages, compensatory damages, punitive damages, liquidated damages, legal fees, and costs to discourage Respondent from engaging in discriminatory or retaliatory treatment of myself or any similarly situated person in the future

DOCUMENTS – I have attached a copy of the following documents:

☒ Charge Of Discrimination form filed with the Equal Employment Opportunity Commission or the Indiana Civil Rights Commission

☒ Notice of Right to Sue letter

☒ Other: Attachment #2 Particulars of Charge and Attachment #3 NLRB Affidavit

FILING FEE – Are you paying the filing fee?

○ Yes, I am paying the $402.00 filing fee. I understand that I am responsible to notify the defendant about this case as required by Federal Rule of Civil Procedure 4. [*If you want the clerk to sign and seal a summons, you need to prepare the summons and submit it to the clerk.*]

☒ No, I am filing a Motion to Proceed In Forma Pauperis and asking the court to notify the defendant about this case.

[*Initial Each Statement*]

JRC   I will keep a copy of this complaint for my records.

JRC   I will promptly notify the court of any change of address.

JRC   I declare **under penalty of perjury** that the statements in this complaint are true.

_____                    12/15/2022
Signature                                           Date

[*DO NOT write in the margins or on the back of any pages. Attach additional pages if necessary.*]

ATTACHMENT #2

# PARTICULARS OF CHARGE
# OF DISCRIMINATION
# AND RETALIATION

Charging Party, Jacob Cable, is a Caucasian male, age 36. Mr. Cable is a qualified individual under the Americans with Disabilities Act as amended (the "ADA"). Mr. Cable was hired by Kuraray Monosol in 2012 as a production associate. Mr. Cable remained employed at Respondents until he was illegally terminated in violation of the Americans with Disabilities Act, Title VII and the Family Medical Leave Act (the "FMLA") in January of 2021.

Prior to disclosing his disabilities, Mr. Cable was never written up or otherwise disciplined. Mr. Cable suffered from depression and anxiety. These health conditions affected one or more of his major life activities. Mr. Cable sought reasonable accommodations from Respondents for the same. Mr. Cable requested time off and leave under the FMLA in June of 2018.

The environment at Respondents was hostile towards individuals that were ill and/or requested leave and/or reasonable accommodations. On June 6, 2019 Mr. Cable requested leave and reasonable accommodations under the ADA and FMLA. Mr. Cable's request for leave under the FMLA was granted. The first day that he returned from leave, Mr. Cable discovered John Murphy in the break room, talking to other employees, in very unflattering terms, about Mr. Cable having taken leave under the FMLA for his disabilities of anxiety and depression.

Shortly thereafter, another employee placed a sign that said "Mental Instability Unit" on Mr. Cable's work station. Pursuant to Respondents own policies, both Mr. Murphy, the employee that placed the sign on Mr. Cable's work station, should have been terminated or at the

very least suspended for several days without pay. But Respondents took little to no corrective action against the offenders. Thus, sending a clear signal that discrimination and retaliation were acceptable, tolerated and welcome in Respondents' workplace.

Respondent had very few minority employees. One employee, in particular, Mike Williams, who was an African American male, was discriminated and retaliated against for his disabilities and requesting reasonable accommodations and leave under the FMLA for the same. Mr. Williams was also singled out and treated differently and worse due to his race. Mr. Cable, who had been active in the Union and was Steward at the plant in Merrillville, Indiana plant authored Mr. Williams's grievances complaining about race and disability discrimination and retaliation under Title VII, the ADA and the FMLA in both 2018 and 2019.

Mr. Cable represented Mr. Williams through the grievance process and opposed the discrimination that Respondent's had subjected Mr. Williams to while at Respondents. Mr. Cable's participation in the process and opposition to the discrimination and retaliation on behalf of Mr. Williams was not well received by Respondents management. In response, Respondents management made it clear to Mr. Cable that he would pay the price for it.

On October 31, 2018, Mr. Cable was on the premises conducting union business. Much to his surprise he was walked off the premises by Assistant Plant Manager, PR Stout and Plant Manger, John Rolfe. Mr. Cable subsequently filed grievance on November 5, 2018, alleging discrimination based on his disabilities and retaliation for his above described protected activities. But the grievance was never processed by Respondent.

Mr. Cable called Vice President of Human Resources John Gornto, shortly afer Mr. Stout and Mr. Rolfe forced him to leave the premises on October 31, 2018. Mr. Cable complained to

Mr. Stout that he had been singled out and treated worse due to his disabilities and above discussed protected activities. But Mr. Gornto did not bother to investigate Mr. Cable's complaints or to remedy the same. Much like had Respondent's had done in the past.

In February of 2019, Mr. Cable was elected the Chief Union Steward. As such, he continued to complain about discrimination against himself and others. And he continued to file grievances on behalf of other employees that were subjected to discrimination based on their race and/or their disabilities and/or retaliation for having engaged in statutorily protected activities.

In December of 2019, Mr. Cable was again singled out and discriminated against by Respondents. On or about December 7, 2019 another employee posted Mr. Cable's Union Steward card and wrote the word "Fag" on it. Mr. Cable complained to Respondents managements about the discrimination and the hostile work environment. But, again, Respondent refused to adequately investigate and remedy his complaints of discrimination.

As a result of the foregoing, Mr. Cable continued to be subjected to a hostile work environment and discrimination based on his disabilities. Co-workers and managers made disparaging comments about Mr. Cable, his disabilities his taking leave under the FMLA. In addition to having complained to the Vice President of Human Resources, Mr. Cable also complained to Human Resources Representative, Michelle Carney, about the ongoing discrimination and retaliation, described above, against himself and others. But Ms. Carney could not be bothered to investigate his complaints on behalf of himself and/or others. And she could not be bothered to take any remedial action and/or to hold the offenders accountable.

On or around September 28th, 2020, employee Susan Phillips, began circulating a document stereotyping and discriminating against Mr. Cable. Ms. Phillips' document described

Mr. Cable as "mentally unstable." She cited Mr. Cable's disabilities as the basis for her assertion. Despite Mr. Cable reporting the discriminatory actions of Ms. Phillips, Respondent failed to discipline her or hold her accountable in any way.

In mid-October, Mr. Cable was required to take a two-week leave of absence because he had been exposed to Covid-19. Shortly after Mr. Cable was released to return to work, he received a letter required him to submit himself for evaluation of his mental health. Without the evaluation he would not have been allowed to return to work. Respondents also required Mr. Cable to seek psychiatric care with the company's EAP psychiatrist.

On December 11, 2020, Mr. Cable was released to return to work by Respondent's EAP Director, Julie Kissee. The only caveat was that Mr. Cable should not work with his former peers and superiors who had previously discriminated against and harassed him. Respondent is a large employer with various areas where it could have placed Mr. Cable so that he did not have to work directly with any of his superiors or peers who had previously discriminated and/or retaliated against him. But Respondent refused to engage in the interactive process with Mr. Cable. It refused to transfer Mr. Cable or to place him in a position where he would not have to interact with the individuals who had previously discriminated and/or retaliated against him. Respondents then terminated Mr. Cable on January 5, 2021 via email.

Respondents have traditionally treated employees without disabilities, and those who have not engaged in protected activities, more favorably than employees, like Mr. Cable, that suffer from one or more disability and/or that engage in protected activities. For example, in April of 2018, Darin Powers, a non-disabled employee, was engaged in an altercation with a co-worker while at work. Mr. Powers physically threatened his co-worker. Respondent did not fire

him. Rather, they gave him a "verbal warning."

After Mr. Cable was terminated he filed a grievance via the Union. He also filed an EEOC Charge numbered 470-2021-02033. His matter was eventually arbitrated in July of 2021. On January 11, 2022 Mr. Cable received the arbitrator's decision ordering Respondents to reinstate him. On January 12, 2022 Mr. Cable received a letter from Respondents telling him that he had been reinstated.

As part of the Arbitrator's decision to reinstate Mr. Cable, Mr. Cable was ordered to again submit himself for a full mental examination by a medical professional to attest to his mental health and fitness for duty. However, the arbitrator required Mr. Cable to obtain the same within thirty days.

Pursuant to the Arbitrator's decision, Mr. Cable immediately began contacting licensed medical professionals to perform the ordered examination and tests. But every licensed professional was several weeks, even months out, before they could see Mr. Cable and examine him. As such, Mr. Cable asked Respondents for an extension of time for the medical examination to be completed.

Respondents refused to engage in the interactive process and/or to enlarge the time period for Mr. Cable to obtain the required physical examinations and terminated him AGAIN on February 11, 2022 via email.

Mr. Cable met or exceeded all of the legitimate performance expectations articulated by the Respondents. However, he faced significant discrimination and/or retaliation based on his disabilities, perceived sexual orientation, his requests for reasonable accommodations and his opposition to discrimination against himself and others based on their race and/or their

disabilities and/or requests for reasonable accommodations.

Mr. Cable alleges Respondent violated Title VII, and the ADA by discriminating and retaliating against him on the basis of his disabilities, his perceived sexual orientation and his participation in protected activities under these statutes. Such discrimination and retaliation is included herein without limitation. But for his disabilities, perceived sexual orientation, and/or requests for reasonable accommodations, and engagement in statutorily protected activities, he would not have suffered the adverse employment actions described herein without limitation. But for Mr. Cable's disabilities, perceived sexual orientation, requests for reasonable accommodations, and/or engagement in statutorily protected activities he would not have otherwise been terminated in January of 2021 and again in February of 2022..

Respondent's acts and omissions have resulted in anxiety, emotional distress, pain, and suffering to Mr. Cable. He has lost income and career and promotional opportunities due to Respondent's unlawful and discriminatory conduct. Mr. Cable has incurred legal costs, expenses, and attorney fees. Respondent's acts and omissions were intentional, willful, wanton and made in reckless disregard for the consequences and harm to Mr. Cable. As a result, he seeks recovery of lost wages, compensatory damages, punitive damages, liquidated damages, legal fees, and costs to discourage Respondent from engaging in discriminatory or retaliatory treatment of Mr. Cable and similarly situated persons in the future.

The above summary is not exhaustive, complete, or inclusive. The acts and omissions described above span a significant time period and are continuing. Mr. Cable has not had an opportunity to review all relevant documents or interview witnesses to refresh his recollection prior to filing this charge. Ms. Cable, therefore, submits this charge alleging violations of Title

VII and the ADA in the broadest possible sense and reserves the right to add, allege and assert additional facts supporting such broad charges.

ATTACHMENT #3

Kuraray MonoSol
Case 25-CA-307131

## CONFIDENTIAL WITNESS AFFIDAVIT

I, <u>Jacob Robert Cable</u>, do hereby state as follows:

I have been given assurances by an agent of the National Labor Relations Board that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the Board and will not be disclosed unless it becomes necessary to produce the Confidential Witness Affidavit in connection with a formal proceeding.

I reside at 2411 North 400 West, La Porte, Indiana, 46350.
My telephone number is (219) 575-9585.
My e-mail address is jakezarratti@gmail.com.

1.   On October 27, 2022, I made several posts on my personal Facebook account.  I was not posting any specific details in those posts but was more just announcing that I was planning to start speaking out soon.  I indicated that I would be sharing a ton of information soon about what had brought us to this point, meaning what had happened to me and the employees at Kuraray MonoSol.

2.   Shortly after making those posts on Facebook—maybe just 24-36 hours later, Scott Bening started following my on my personal LinkedIn account.  Bening was formerly the CEO of Kuraray MonoSol, but he retired shortly after my first termination.  I understand he went on and got rehired at Kuraray Group and he is now working as a senior executive advisor for the Kuraray Innovation Network Center and as a board member at MonoSol; he is also the president

**PRIVACY ACT STATEMENT**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initial: _J.C._

of MBS2 Advisors, but I am not familiar with that company and do not know if they have any connection to Kuraray.

3.      I believe I have just under 600 followers on Facebook. I do not post a lot on LinkedIn and am not very active there, so I believe I only have around 84 followers and 62 connections on that program. I believe I may have only used my LinkedIn to speak out against Kuraray MonoSol maybe one time. I was not following Scott Bening on any of the social media applications, although I believe I was friends with a couple of different managers that work at Kuraray MonoSol. Bening only followed me on LinkedIn and did not try to friend me on Facebook.

4.      I paused my plan to start posting information on Facebook after Scott Bening started following me. It was all very emotional, exhausting, and I was sick of explaining everything, so I paused because I was hoping that Bening starting to follow me meant that we were going down a different avenue, that he was reaching out to find some type of resolution. But I was also worried that Bening following me on LinkedIn was an attempt to intimidate me because I had planned to start speaking out again. On November 6, 2022, I sent Bening a message through LinkedIn asking him if he was following me because he was trying to intimidate me or because he wanted to hear my side and hopefully come to a resolution. I provided Bening with my phone number so he could contact me to work towards a resolution. But I also knew that if Bening did not respond to my message and contact me, then his only reason for following me was to try and intimidate me into not speaking out. Around the same time I sent a separate, but similar message to Christian Herrmanns, who replaced Bening as the Kuraray MonoSol CEO, and asked to talk to him so we could reach a resolution. I did not get a response to my messages from either Bening or Herrmanns.

Page 2 of 6                                                                     Initial: _____

5.      After not receiving a response from Scott Bening or Christian Herrmanns, on November 11, 2022, I started posting information on Facebook.

6.      The allegations in this charge are about everything that brought me to this point, about Kuraray MonoSol and its management team (and the Teamsters Local 135, too) kicking me when I was down, treating me like a freak show, like a monster, like I was so bad that I could not even come in and clean out my locker and they just had to mail everything to me instead. And then two years after I had even physically worked for Kuraray MonoSol, its former CEO and now an advisor and member of the board starts following me on LinkedIn to try and intimidate me. Scott Bening and Kuraray MonoSol thought they were getting away with it all, but then I posted on Facebook that I was going to start speaking out. I know Bening followed me on LinkedIn just to try and intimidate me, to mess with me, and coerce me into not speaking out about everything that had happened to me and the employees at Kuraray MonoSol. Once Bening started following me, I was scared and apprehensive about speaking out and I hoped he was going to reach out and work towards a resolution. But once he did not respond to my message, I started posting on Facebook and then I was going to keep posting.

7.      I was scared and apprehensive of Scott Bening following me because of his roles at Kuraray MonoSol, how powerful he is, and his reach. Bening has a lot of political connections; I have seen pictures of him with Mike Pence. And Bening is also connected to law enforcement, after they started following me and parking outside my house to watch me and the other things they did to me. It all really made me uncomfortable and worry about what was going on with my future. I was hoping for resolution with Bening, but now that he did not respond to my message so his goal must be to intimidate and coerce me, I want him confronted and for somebody to make him stop. Why else would Bening follow me? What is his

Page 3 of 6                                                          Initial: _____

reasoning? Why start following me, just to see what I am up to after Kuraray MonoSol terminated me two times? It must be because he is trying to intimidate and coerce me into remaining silent. I am not super familiar with LinkedIn, but I would think that I could now block Bening from following me. But like with anything else, once the message had been sent (that he was trying to intimidate and coerce me), even if I now blocked him the message had already been sent.

8.      I think the other thing that Scott Bening following me on LinkedIn shows is that it is all part of the big picture, part of Kuraray MonoSol's efforts to mess with the employees and undermine contract bargaining. I had previously sent a pretty rude message to Tim Boyle, one of the global managers at Kuraray MonoSol. (I had to send the message to Boyle because Bening had blocked me from communicating with him so I could not send it directly to Bening.) Nobody responded to that message, but Bening now has started following me on LinkedIn because I am planning to speak out. The employees at Kuraray MonoSol are in the third round on contract negotiations; they harassed me during the last set of contract negotiations when I was chief steward and now they have escalated to the point of taking me out completely. But even after Bening had retired and disengaged from Kuraray MonoSol and I have been terminated twice, he is still coming at me to keep me quiet. I do not know that Bening cares about me so much as all of the other people at Kuraray MonoSol, the employees that he thinks he has control and power over.

9.      I have been concerned that Teamsters Local 135's representation has always been subpar. So my wish for this process, if this charge is able to be connected to the ongoing negotiations (the employees are all currently out on strike), is that it could offer protections to that group. I would be more than happy for the Board to utilize this charge for that purpose, that

Page 4 of 6                                                                                    Initial

would be great; that group of employees needs protection. With all of the 4-60s they have been having to work, the racism that goes on at Kuraray MonoSol. I do not know why the union abandoned us there, but they did. If I could protect the employees, if this charge would help, I would like that. I was there during the last contract negotiations to protect them, but I am not there this time. I have reached out to Dustin Roach and told him that I am willing to do whatever I can to help the members, but I have not heard back from him. Looking back on all of the things that Kuraray MonoSol has done, how they discharged me juts for a supposedly paranoid ideation even though I had no prior write-ups, bringing me to this point, and now Scott Bening is following me on LinkedIn to try and intimidate me into being silent. The employees at Kuraray MonoSol have voted to strike three times with each of the three contract negotiations. This group is disgruntled and unhappy and it was my job as their chief steward to try and keep them safe and healthy, but Kuraray MonoSol prevented me from doing that. So anything the Board can do to help would be appreciated. They said I was paranoid, but my opinion is not paranoid when 200 people went out on strike over the very issues that I had been raising and trying to resolve, about the overtime issues and racism.

Page 5 of 6

Initial: _J.C_

I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read the above statement consisting of 6 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct.

Executed on: _12·12·2022_
Signed on: _12·13·2022_ (date)

_Jacob Robert Cable_ _____ (signature)

Prepared via videoconference this 12th day of December 2022.

_Derek A. Johnson_ _____
Derek A. Johnson, Board Agent
National Labor Relations Board

Initial: _J.C._